**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

LOIS KRAMER,

        Plaintiff,

v.                                  Case No. 04-CV-74362-DT

PAUL REVERE LIFE INSURANCE CO. and
PROVIDENT LIFE AND ACCIDENT
INSURANCE COMPANY,

        Defendants.

_____/

**ORDER GRANTING IN PART AND DENYING IN PART**
**PLAINTIFF'S MOTION FOR LEAVE, PLAINTIFF'S MOTION FOR JUDGMENT AND**
**DEFENDANTS' MOTION FOR JUDGMENT**

        This case involves a claim for benefits under 29 U.S.C. § 1132(a)(1)(B).

Currently pending before the court are cross-motions for judgment.  The court has

reviewed the motions and determined that a hearing on the matter is unnecessary. *See*

E.D. Mich. LR 7.1(e)(2).  For the reasons stated below, the court will grant in part and

deny in part both Defendants' motion and Plaintiff's motions.

## I.  INTRODUCTION

        Plaintiff Lois Kramer is a physician who was formerly employed by Henry Ford

Health System ("Henry Ford") as an obstetrician/gynecologist ("OB/GYN").  While

employed by Henry Ford, Plaintiff was covered under a group long term disability plan

issued by Defendant Paul Revere Life Insurance Company ("Paul Revere").  Through

her employer, Plaintiff additionally purchased a disability insurance policy with

Defendant Provident Life & Accident Insurance Company ("Provident").  Although these

two insurance companies were separate entities at the time Plaintiff began her

coverage, the two companies subsequently merged, first with each other and then with Unum Life Insurance Company of America, ultimately becoming part of the UnumProvident Corporation.[1]

In 1998, Plaintiff submitted a claim for long term disability benefits under each of her policies, asserting that her degenerative cervical spine disease and other physical complications rendered her disabled. While Defendants originally approved her claims, approximately five years later Defendants determined that she was no longer precluded from performing the functions of her job. Plaintiff appealed, and her appeal was administratively denied on September 7, 2004. The instant lawsuit followed.

## II.  BACKGROUND

### 1.  Policy Provisions

The Provident policy provides:

Total Disability or Totally Disabled means that due to Injuries or Sickness:

> 1.  [Y]ou are not able to perform the substantial and material duties of your occupation; and

> 2. [Y]ou are receiving care by a Physician which is appropriate for the condition causing the disability.  We will waive this requirement when continued care would be of no benefit to you.

---

[1]For this reason, Defendants Paul Revere and Provident are sometimes referred to, collectively, as "Defendant" or "Unum."  It also appears that Plaintiff's claims under the two policies were reviewed collectively by the same individuals, and that the same determinations with respect to Plaintiff's eligibility were made as to both claims.  Thus, although there are two administrative records, the parties cite to both in support of their positions under each separate policy.  Although the Paul Revere administrative record is significantly larger than the Provident administrative record, there do not appear to be any material differences between the evidence contained in each of the administrative records.  The court will, following the parties' lead, cite to the Paul Revere administrative record as PRL, followed by a page number, and the Provident administrative record as PLA, followed by a page number.

(PLA 617.)  Thus, the Provident policy is an "own occupation" policy, which means that to qualify for benefits Plaintiff need only be unable to perform the substantial and material duties of her own occupation as an OB/GYN, rather than being unable to work in any occupation.  Under the Provident policy, "your occupation" is defined as "the occupation (or occupations, if more than one) in which you are regularly engaged at the time you become disabled."  (PLA 617.)

The Paul Revere policy is similarly an "own occupation" policy.  Under the Paul Revere policy, "total disability" means that the employee:

    1.  is unable to perform the important duties of his own occupation on a Full-time or part-time basis because of any injury or sickness that started while insured under this Policy; and

    2.  does not work at all; and

    3.  is under Doctor's Care.

(PRL 450.)  The Paul Revere policy also contained a residual disability provision, which provides that the employee is considered residually disabled, and qualifies for benefits, if, among other things, he is unable to perform the important duties of his own occupation on a Full-time basis, but is able to perform one or more of the important duties of his own, or any occupation, and is earning less than 80% of his prior earnings. (*Id.*)  The parties do not address the residual disability provision, despite the fact that for a time Plaintiff operated a business out of her home.  The parties seem to agree that the relevant question under the Paul Revere policy is whether Plaintiff could perform the "important duties" of her own occupation as an OB/GYN, and the court will therefore focus its inquiry on that issue.

3

## 2.  Administrative Record Review

Plaintiff was born on September 25, 1946.  Medical evidence of her cervical pain exists at least as early as January 24, 1989, and her records refer to a CT scan in 1987. (PLA 23, 25.)  On October 6, 1995, she was examined by Maria Conti, a physical therapist, who noted Plaintiff's obvious guarded movements of the neck and arm.  (PLA 28.)  Plaintiff reported neck pain and left arm pain which affected her work.  She had to take breaks during exams and could not perform surgeries.  (*Id.*)  She also reported taking Vicodin and Flexeril in the evenings, and Motrin and Tylenol # 3 during the day with only minor relief.  (*Id.*)  On October 17, 1995, Plaintiff was given an MRI of the cervical spine.  (PLA 32.)  Dr. William Sanders noted focal central disk herniation at the C4-C5 level causing mild compression of the left side of the spinal cord and mild to moderate spinal stenosis at the C5-C6 level.  (*Id.*)  Plaintiff had a post myelogram CT on November 1, 1995, at which time Dr. Richard Silbergleit found "multiple level disc bulges/herniations and neural foraminal stenosis."  (PLA 36.)  Plaintiff underwent surgery (a C6-7 laminectomy) on December 12, 1995.  (PLA 41.)

Dr. Ghaus Malik treated Plaintiff before and after her surgery.  On two occasions following her surgery, she told him that she continued to experience pain and difficulty performing the functions of her job.  (PL 45, 47.)  On November 26, 1996, Dr. Lori B. Schneider reported Plaintiff's EMG/NCU test results, stating "[t]here is electrodiagnostic evidence of a remote left C7 radiculopathy with no ongoing denervation.  There is also evidence of a chronic left C8 radiculopathy with mild ongoing denervation."  (PLA 49.)  Plaintiff visited a neurosurgeon, Dr. Russ Nockels, on January 31, 1997.  (PLA 48.)  He

4

noted continued complaints of pain and an effect on Plaintiff's profession.  (*Id.*)  Dr.

Nockels found "some weakness in the biceps, brachial radialis, triceps, and finger

extensors of the left hand."  (*Id.*)  Another MRI was performed, at Dr. Nockel's request,

on February 13, 1997.  (PLA 51.)  Drs. Ravi P. Kodali and Suresh C. Patel reviewed the

results and found "[m]ultiple levels of cord compression without an intrinsic signal

abnormality in the cord.  The spondylostenosis is worse at C5-C6.  Overall the

appearance is unchanged when compared to the prior study."  (*Id.*)

Nerve root injections were attempted on May 7 and 9, 1997.  (PLA 132-33.)

Plaintiff continued to experience pain and, on May 30, 1997 and July 15, 1997, two

different physicians noted that Plaintiff's pain interfered with her professional

responsibilities.  (PLA  54, 84.)  Plaintiff stopped working on September 1, 1997.  (PLA

56.)  Plaintiff continued to try different treatments for her pain, including acupunction, a

"Jobst stocking" and Vicodin.  (PLA 17.)  On February 26, 1998, Dr. Maria Pleskacz

noted "some objective evidence of slight diminution [of strength] on the left compared to

the right."  (*Id.*)  Plaintiff returned to Dr. Pleskacz on May 20, 1998, and the radiculitis

was still present.  (PLA 18.)  Dr. Pleskacz also recorded a slight weakness on the left

arm.  Because of Plaintiff's increased depression over her medical situation, she was

prescribed Paxil.  (*Id.*)

Plaintiff applied for disability benefits in the fall of 1998.  The attending physician

statement submitted with her application indicates that her present limitations were

"can't deliver babies, can't do surgeries, can't perform multiple pelvic exams or

colposciopies."  (PLA 304.)  On September 30, 1998, Defendant's investigator spoke

with Dr. William Anderson, the Acting Chair of Plaintiff's department.  (PRL 97.)  Dr.

Anderson told the investigator that Plaintiff's condition caused her difficulty in extending her arm and doing deliveries, pelvic exams and surgeries. (*Id.*) He also indicated that the hospital did not have partial work available and that an OB/GYN must be able to perform all aspects of her job. (*Id.*)

Plaintiff's application was conditionally approved on October 15, 1998. (PLA 296.) Defendant requested additional clarification of the occupational duties which Plaintiff was performing prior to her last day of work. (*Id.*) After Plaintiff submitted the additional information, and additional medical documentation, her claim was approved.

Plaintiff continued to receive disability payments and, at some point, her file was transferred to the Extended Duration Unit ("EDU"). (PLA 295.) Plaintiff was only required to submit quarterly, rather than monthly physician statements. (PLA 158.)

Plaintiff's pain condition remained "fairly stable." (PLA 152.) She continued to take Vicodin. (*Id.*) On May 5, 1999, she reported taking Vicodin twice a day, once in the morning and then again around 2:00 or 3:00. (PLA 166.) Plaintiff has indicated that she tried to stretch the time between doses because she did not want to take Vicodin more than twice a day. (*Id.*) She continued to wear the sleeve. (*Id.*) Around this time she also began a home travel agency, and stated that it did not aggravate the arm. (*Id.*)[2]

On June 28, 1999, Defendant had Plaintiff's records reviewed by an internal consultant, Dr. Paul Martin. Dr. Martin reported that "[i]t would appear that since 9-97 that [sic] claimant's abilities have steadily gone downhill rendering her totally incapable

---

[2]Plaintiff abandoned this business in October of 2002 because it was "more trouble than it was worth." (PLA 457.)

6

of performing any ob/gyn practice and procedures." (PRL 50.) Dr. Martin recommended that if Plaintiff was not being treated by a neurologist, Defendant should consider an independent medical examination by a neurologist or neuro-surgeon. (*Id.*) There is no indication that Defendant followed up on this suggestion.

In September of 1999, Plaintiff visited Dr. Pleskacz, who noted that Plaintiff had gained almost twenty pounds in the past year, which was attributed to decreased exercise due to pain. (PRL 325.) Four months later, she saw Dr. Pleskacz again, and the records indicate that she had increased her Vicodin usage to 2.5 times daily. (PRL 327.) Her continued to exhibit left cervical radiculitis with a neuropathic pain syndrome. (*Id.*) Dr. Pleskacz also recorded that Plaintiff's neck was occasionally bothersome as was the trapezius. (*Id.*) Plaintiff had another appointment with Dr. Plexkacz on May 5, 2000, at which time Dr. Pleskacz reported that Plaintiff was having increased difficulties with the discomfort in her left arm. (PRL 329.) Plaintiff was still taking Vicodin and, additionally, had begun taking Zocor every other day. (*Id.*) Dr. Plesckacz decided to refer her to a neurologist and to switch her to a Fentanyl patch. (*Id.*)

On June 28, 2000, Plaintiff visited a neurologist, Dr. Mark Silverman, who summarized the visit as follows:

> In summary, we have this 53-year-old female who is status post cervical laminectomy at C7. The patient, unfortunately, has had persistent right forearm pain, which has been quite difficult to treat and she has tried multiple medications without benefit. Previous MRI scan most recently in February 1997 showed small central disc hermiation posteriorly at C4-C5 with osteophytosis causing slight compression of the cervical cord anteriorly. C5-C6 showed facet hypertrophy and a moderate to severe degree of nueral foraminal narrowing. At C6-C7 there is facet hypertrophy and a moderate degree of cord compression. At C7-T1 there is no significant abnormality. There is incidental note of a low signal at the lamina of C6 likely related to the previous surgery.

7

(PLA 215.)  Dr. Silverman prescribed Neurontin at 100 mg, three times a day, and ordered another MRI scan.  (*Id.*)  The MRI was conducted on August 15, 2000.  (PRL 497.)  The MRI revealed disc space narrowing at C5-C6 and C6-C7. At C6-C7, the MRI further revealed an impression upon the posterolateral thecal sac, abutting the spinal cord, which was likely a bone spur at the laminectomy site.  (*Id.*)  Dr. Silverman reviewed the MRI results and concluded that Plaintiff's symptoms were related to the bone spur at C6-C7, "which protrudes posterior into the left, abutting the spinal cord." (PRL 498.)  He did not believe that Plaintiff would be willing to undergo further surgical intervention without a guarantee that her condition would improve, which no doctor could give her.  (*Id.*)

In May of 2000, Defendant decided to perform surveillance on Plaintiff, primarily because she reported that she went to her cottage and sailed.  (PRL 416.)  Surveillance was conducted in December of 2000.  The surveillance did not reveal any inconsistencies or extreme activity.

On April 9, 2001, Dr. Barbara Parke performed an internal review of Plaintiff's file.  (PLA 259.)  She reported "[a]t this time, there is sufficient objective information to support [Plaintiff's] c/o pain in her left arm (MRI, EMG, post-op changes in the cervical spine) and inability to use that extremity for consistent lift/pull/push."  (PLA 259.)  Dr. Parke suggested a neurosurgery IME and additional surveillance, "if further validity is desired."  (*Id.*)

Plaintiff's medical records from September of 2001 indicate an increased heaviness in the neck, which was worse with the turning of the head.  (PLA 436.) Plaintiff continued to receive periodic check-ups, with no material change in her

8

condition.  Another MRI was performed on June 7, 2002, again with no material change.

(PLA 424.)  Sometime thereafter, Plaintiff began physical therapy, and also reported

that her fingers were feeling numb.  (PLA 438.)  Her doctor noted a decrease in her arm

muscle strength and a decrease in her grasp.  (PLA 438-439.)

Additional surveillance was conducted on October 15, 2002, and November 12-

16, 2002.  The court has reviewed the video of this surveillance, as well as the

surveillance summary.  (*See* PLA 482-94.)  Defendant places much emphasis on this

surveillance, and it will be discussed in further detail in the court's discussion section.

Briefly, the surveillance exhibits Plaintiff performing various chores and errands in and

around her home and, on one occasion, spending a portion of a day preparing a

sailboat for storage.

Defendant scheduled an appointment for Plaintiff to visit Dr. Charles Harvey for

an IME on November 12, 2002.  (PLA 362.)  The exam was purposefully scheduled

during a time that Defendant was conducting surveillance on Plaintiff.  (PLA 497.)  Dr.

Harvey's report from November 12, 2002 does not appear in the administrative record.

Defendant's records state that they were never given a copy of the IME report "due to

physician negligence."  (PRL 912.)  Plaintiff was also never given a copy of the report,

and in response to a subpoena issued in this litigation, Dr. Harvey indicated that the file

was no longer in existence.  (Pl.'s Mot. Br. at xxvii n. 13.)

Defendant scheduled another IME in the fall of 2003.  In scheduling the IME,

Defendant's files include the following notation: "Ensure we choose a location that

doesn't provide the same concerns as the one before given the [claimant] was a

physician in that area."  (PRL 912.)

9

Dr. Phillip Mayer performed the IME on June 6, 2003.  (PLA 535.)  He reviewed Plaintiff's medical records, conducted a physical examination and concluded that "[s]he did not have any objective abnormalities to suggest ongoing cervical radiculopathy." (PLA 532.)  He could find "no objective reason why this individual should not be able to perform her functions as a physician in the specialty of obstetrics/gynecology."  (PLA 531.)  Dr. Mayer requested another EMG due to Plaintiff's continued complaints.  (*Id.*) On July 17, 2003, Dr. Mayer issued a one-paragraph supplemental report, after reviewing the surveillance videos.  (PLA 553.)  He stated that "[r]eview of th[e] surveillance tape reinforces the fact that she is capable of strenuous activities and performing the duties of her job as a physician in this specialty of obstetrics-gynecology."  (*Id.*)

Defendant performed another internal review of Dr. Kramer's file.  Dr. Geron Brown reviewed Plaintiff's file and Dr. Mayer's report, and found Dr. Mayer's report to be persuasive.  (PLA 544.)  Dr. Brown stated "[t]he objective medical findings in the records do support some level of impairment.  However, this impairment is mild and would not be expected to preclude a light physical demand occupation.  No restrictions or limitations for this individual's profession are indicated."  (*Id.*)

Dr. Butler-Jackson, Plaintiff's treating physician, was provided a copy of the IME report.  She responded by informing Defendant that Plaintiff had been evaluated by Neurosurgery, Neurology and Internal Medicine for the continued pain in her left arm and hand.  (PLA 558.)  Dr. Butler-Jackson indicated that none of her treating physicians had ordered any further EMGs since 1996, and stated that there was no medical reason for an EMG.  (*Id.*)  Dr. Butler-Jackson, however, referred Plaintiff to another doctor, Dr.

10

Green, for a second opinion regarding an EMG.  (*Id.*)  Plaintiff visited Dr. Green on

September 18, 2003, but he made no recommendation regarding an EMG, instead

choosing to wait for the neurosurgeon's recommendations.  (PLA 564.)

Defendant informed Plaintiff on August 19, 2003, that her file was under review

and that Defendant had concerns about the continuation of her benefits.  (PLA 561-

559.)

Plaintiff saw the neurosurgeon on October 24, 2003, Dr. Mark Silverman.  (PLA

577.)  Dr. Silverman did not indicate any changes in her condition, but stated:

> I am concerned about [Plaintiff] returning to work at her previous
> occupation.  I believe that she may be able to perform some of the
> activities of her regular duties as a gynecologist for a short period of time
> during the day; however, it would seem to me unlikely that she could
> continually use her arms throughout the day doing procedures and office
> work.  I do feel that her current symptoms are representative of the
> underlying cervical disk pathology and spondylosis that is noted on the
> most recent MRI.
>
> I feel a bigger issue may be the safety of her patients, especially in the
> operating room with the necessity for her to perform surgery and the
> substantial duties of her specialty.  This is especially in regard to surgical
> procedures that require traction particularly on the forearms for an
> extended period of time, which I feel unlikely that she would be able to
> perform for a prolonged amount of time.  Unfortunately, I don't believe that
> she can return to work in her current status. . . .

(PLA 575-76.)

Plaintiff visited rheumatologist Lydia Lasichak on November 11, 2003.  Dr.

Lasichak noted, among other things, that Plaintiff must use Vicodin up to three times a

day and that she was also on Vioxx, Zocor, Prempro and Synthroid.  (PLA 574; PRL

710.)  She conducted a physical examination, indicated that she knew Dr. Mayer had

stated that Plaintiff could return to work, and stated:

11

> I do not believe Dr. Mayer fully understands what an OB/GYN doctor must
> do. It is a two-handed profession. She is using sharp instruments intra-
> abdominally and intrapelvically, many times through a laparoscope, and
> particularly in something such as with a vaginal approach for a
> hysterectomy I think that it would be extremely difficult for Dr. Kramer and
> also extremely dangerous for the patient to have a surgeon who would
> lose control of the use of her upper extremity at such a time, even with
> somebody standing by to help in case she ran into trouble. It seems
> ludicrous to have a doctor on standby to allow Dr. Kramer to do her job
> and perhaps injure the patient before the standby doctor can get there. I
> do not see how she can perform the activities related to her job.

(PLA 574; PRL 710.) Dr. Lasichak also acknowledged that "[t]rue, [Plaintiff] can do her

activities of daily living, but a patient's life is not in jeopardy, nor is there any chance for

bodily harm to another human being when she is hanging up her clothing at home."

(*Id.*)

Dr. Butler-Jackson sent Dr. Lasichak's report and Dr. Silverman's report to

Defendant on December 12, 2003, writing "[h]opefully, this will put to rest the

inconceivable notion that [Plaintiff] can return to her practice of OB/GYN." (PLA 578.)

Defendant terminated Plaintiff's benefits under both policies on December 18,

2003. (PLA 589-585.) Defendant stated that "as no diagnostic studies were done as

suggested by the IME provider, we do not feel that Dr. Silverman and Dr. Lasichak's

reports provided any additional information to refute our determination regarding your

ability to perform your occupational duties as obstetrics/gynecologist." (PLA 585.)

Plaintiff timely appealed this decision.

On March 21, 2004, her former supervisor, Dr. William Anderson, wrote a letter in

which he stated that "[w]ith my knowledge of what is required to obtain employment and

be retained in employment in the practice of Gynecology and Obstetrics, I find [Plaintiff]

unemployable." (PRL 778.) He noted that while under his supervision, she could not

effectively carry out obstetrical maneuvers in the delivery unit, had difficulty in routine office activity, and had begun requesting that her colleagues perform major and minor surgical procedures for her.  (*Id.*)  Dr. Clark P. Kirkman, Division Head of Obstetrics and Gynecology at Henry Ford Hospital, also wrote to Defendant, stating that Plaintiff's departure from Henry Ford in 1997 "was not a willing departure on her party but she could not fulfill departmental work obligations to her patients because of physical limitations."  (PRL 777.)  Finally, Plaintiff submitted a letter from Patricia Tumas, Plaintiff's former medical assistant, who stated that Plaintiff did not want to give up her practice but "she had reached a point where she was unable to meet the very demanding physical requirements of her profession in the office, in the operating room, and in the delivery room."  (PRL 776.)

On June 1, 2004, she underwent an EMG.  (PRL 884.)  Dr. Silverman reviewed the EMG and concluded:

> There is electrodiagnostic evidence of low cervical radiculopathy as described above.  There is evidence of reinnervation of the left biceps and left triceps muscles as evidenced by the polyphasia that is noted.  With the small fibrillations within low cervical paraspinal muscle, an acute cervical radiculopathy cannot be completely excluded.  Thus, an MRI scan of the cervical spine has been ordered. . . .

(PRL 884.)  On June 12, 2004, another MRI was performed on Plaintiff.  (PRL 883.)  Dr. Roger Gonda reviewed the MRI and reported no changes since the June 7, 2002 MRI except that "[t]here has been a slight increase in the size of disc bulge or small herniation to the left at C6-7 and where there is now some deformity on the exiting nerve root sleeve complex."  (PRL 883.)

These new records, along with the rest of her file, were reviewed internally by Dr. David Frank, who found that the new information submitted by Plaintiff did "not appear

13

to provide clinical assessment findings that present a clear understanding for the

physicians presenting opinions of the claimant being totally unable to work." (PRL 888.)

Defendant then requested another file review by outside consultant Dr. Mark Ross. Dr.

Ross wrote:

> On purely objective grounds, I would agree that there is no medical documentation providing objective evidence to support to [sic] the inability to use the left upper extremity during functional work activities in the manner [Plaintiff] describes. However, neuropathic pain conditions do not always have objective findings that match the patient's subjective complaints.
>
> There does appear to be consistent subjective support of her limitations offered by multiple healthcare providers in addition to herself. While some of the information provided by other physicians seems "coached," I feel it would be unfair to completely ignore it. It seems to ultimately come[] down to a question of trust and belief of subjective symptom reporting. I will have to leave that decision to others, as it is a non-medical one.
>
> Again, in summary, it is my opinion after reviewing the records that there is insufficient objective medical evidence to support Dr. Kramer's claims of inability to perform her usual and customary duties as an OB/GYN physician. The records do indicate that she was able to practice on a full time basis for two years without doing all the activities (some of which she states that she had difficulty performing). It is unclear to me how much of the tasks with which she has great difficulty represent an integral portion of her more recent work requirements. It is not uncommon for surgeons to change their type of practice over the course of their years in practice.

(PRL 894.)

Plaintiff's appeal was denied on September 7, 2004. (PRL 905.)

### III. STANDARD

The district court reviews a denial of benefits challenged under 29 U.S.C. §

1132(a)(1)(B) *de novo* "unless the benefit plan gives the administrator or fiduciary

discretionary authority to determine eligibility for benefits or to construe the terms of the

plan." *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115 (1989); *Marks v.*

*Newcourt Credit Group, Inc.*, 342 F.3d 444, 456 (6th Cir. 2003).  "If a plan affords such discretion to an administrator or fiduciary, we review the denial of benefits only to determine if it was 'arbitrary and capricious.'"  *Marks*, 342 F.3d at 456 (citing *Miller v. Metro. Life Ins. Co.*, 925 F.2d 979, 983 (6th Cir. 1991)).  A district court will uphold the determination of an administrator under the arbitrary and capricious standard if it is "rational in light of the plan's provisions."  *Id.* at 457 (quoting *Borda v. Hardy, Lewis, Pollard & Page, P.C.*, 138 F.3d 1062, 1066 (6th Cir. 1998)).

With respect to the policy Plaintiff purchased from Provident, the parties agree that there is no clause within the policy granting discretionary authority to Defendant. Thus, this court will review the denial of Plaintiff's disability claim, under the Provident policy, *de novo*, which means "without deference to the decision or any presumption of correctness, based on the record before the administrator."  *Perry v. Simplicity Eng'g, a Div. of Lukens General Ind., Inc.,* 900 F.2d 963, 966 (6th Cir. 1990).  In making this review, the court is limited to the administrative record.  *Id.*; *see also Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609, 618 (6th Cir. 1998).

The parties also agree that the requisite grant of discretionary authority is contained within the contract forming the Paul Revere policy issued by Henry Ford. Defendant therefore correctly asserts that the court must apply an arbitrary and capricious standard.  *See Killian v. Healthsource Provident Adm'rs, Inc.,* 152 F.3d 514, 520 (6th Cir. 1998).  Plaintiff, however, argues that the court should review the Paul Revere claim *de novo,* due to the conflict of interest which the court found in its June 6, 2005 order.  Specifically, the court found that an irrebuttable presumption of a conflict of interest exists in this case because the administrator of the plans doubled as the payor.

15

(*See* 6/6/05 Order.)  When an entity both funds and administers the plan at issue, "there is an actual, readily apparent conflict."  *Killian v. Healthsource Provident Admin., Inc.*, 152 F.3d 514, 521 (6th Cir. 1998).  Furthermore, the Supreme Court has noted that "if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a 'facto[r] in determining whether there is an abuse of discretion.'"  *Bruch*, 489 U.S. at 109 (quoting Restatement (Second) of Trusts § 187, comment d (1959)).

Plaintiff makes several policy arguments why the existence of this conflict of interest should persuade this court to adopt the standard utilized by the Ninth and Eleventh Circuits.  (Pl.'s Mot. Br. at ix-x.)  As Plaintiff acknowledges, however, the Sixth Circuit has not "adopted that standard and has instead stated that application of the arbitrary and capricious standard is to be 'shaped' by the 'circumstances' of the conflict of interest."  (*Id.* at x (citing *Borda v. Hardy, Lewis, Pollard & Page*, 138 F.3d 1062, 1069 (6th Cir. 1998).)  Indeed, in *Borda*, the Sixth Circuit held that it was "well established" that the existence of a conflict of interest "does not require us to abandon the 'arbitrary and capricious' standard of review."  *Borda*, 138 F.3d at 1069.  Instead, "the abuse of discretion or arbitrary and capricious standard still applies, but application of the standard should be shaped by the circumstances of the inherent conflict of interest."  *Id.* (quoting *Miller v. Metro. Life Ins. Co.*, 925 F.2d 979, 984 (6th Cir.1991)).  The conflict of interest is just one factor which must be weighed when determining whether Defendant acted improperly.  *Killian*, 152 F.3d at 521.  The court therefore rejects Plaintiff's policy arguments and invitation to apply Ninth or Eleventh Circuit law, and will instead follow

16

the dictates of the Sixth Circuit and apply the arbitrary and capricious standard when reviewing the Paul Revere claim for benefits.

The arbitrary and capricious standard is "highly deferential," *id.* at 520 (citing *Yeager v. Reliance Standard Life Ins. Co.*, 88 F.3d 376, 380 (6th Cir.1996), and "requires that the decision 'be upheld if it is the result of a deliberate principled reasoning process, and if it is supported by substantial evidence,'" *id.* (citing *Baker v. United Mine Workers of America Health & Ret. Funds*, 929 F.2d 1140, 1144 (6th Cir. 1991)). The standard "is the least demanding form of judicial review of administrative action . . . . When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." *Perry,* 64 F.3d at 242 (6th Cir. 1995) (quotations omitted).

## IV.  DISCUSSION

### A. Preliminary Issues

Before addressing the merits of Plaintiff's claim for benefits under the Paul Revere and Provident policies, the court will first dispose of a few preliminary issues.

### 1.  "Procedural Challenges"

First, in Plaintiff's motion for judgment, Plaintiff argues that Defendant failed to comply with its claim manuals and other required procedures, and supplies five examples of Defendant's alleged failure. The court will not treat Plaintiff's argument as a resurrection of any formal procedural challenge under ERISA. In its June 6, 2005 order, the court required that all procedural challenges be presented to the court by July 1, 2005. Plaintiff timely filed her challenges, which the court resolved in its February 10, 2006 order. The court will not allow Plaintiff a "second bite at the apple," by treating her

17

current arguments as additional procedural challenges under ERISA.  In any event, Plaintiff's challenges do not cite to any specific provision of ERISA which Defendant's actions are alleged to have violated.  Instead, Plaintiff cites examples of Defendant's alleged improper handling of her claims in order to further advance her larger argument that Defendant acted with bias in arbitrarily and capriciously denying her purportedly meritorious claims for benefits.  In its February 2006 order, the court did state that it would address Plaintiff's allegations of bias and conflict of interest in relation to its analysis of the appropriate standard of review.  (2/10/06 Order n.5.)  Thus, while the court will not treat Plaintiff's current challenges as raising a statutorily-based procedural challenge, the court will consider these arguments, as one factor in determining whether Defendant, operating under an alleged conflict of interest and bias, arbitrarily and capriciously denied Plaintiff's claim under the Paul Revere policy.

## 2. Plaintiff's Motion for Leave

Consistent with the court's February 10, 2006 order and March 10, 2006 stipulated order, Plaintiff filed a motion for judgment, followed by Defendant's combined response and motion for judgment and Plaintiff's combined response and reply. Thereafter, Defendant filed a sur-reply in further support if its motion for judgment.  In her May 24, 2006 "Motion for Leave . . .," Plaintiff objects to Defendant's sur-reply, and asks the court to either strike Defendant's sur-reply or allow Plaintiff to file a supplemental brief, which she attached to her motion for leave.  Defendant filed a response to the motion, and the issue has now been exhaustively briefed.

While not expressly allowed by the court's February and March 2006 orders, it is not uncommon to file sur-replies in cases where there are cross-motions for judgment.

18

The local rules provide that dispositive motions are followed by a mandatory response and an optional reply. *See* E.D. Mich. LR 7.1(c)(1)(A). Defendant's "sur-reply" is essentially its reply brief, as allowed by Local Rule 7.1. The court will therefore decline to strike it.

Inasmuch as Plaintiff's proposed supplemental brief has already been submitted and reviewed by the court, and as Defendant has had an opportunity to respond, the court will grant Plaintiff's request for leave to file its supplemental brief. While the court is normally not inclined to grant such relief, there is nothing prejudicial (nor, indeed, anything substantially new) in the supplemental brief of Defendant's response that affects this court's ultimate conclusion on the merits of the parties' cross-motions. Thus, the court will make an exception to its general practice and allow the extraneous briefing which has already been submitted to the court. Plaintiff's motion for will therefore be granted in part.

### B. Review of Denial of Benefits

### 1. Provident Policy

Applying a *de novo* standard, the court will first review Defendant's denial of Plaintiff's claim for benefits under the Provident policy.

### a. "Substantial and Material Duties"

As stated above, the Provident policy is an "own occupation" policy, which means that to qualify for benefits Plaintiff must be unable to perform the substantial and material duties of her own occupation as an OB/GYN. (PLA 617.) When determining the substantial and material duties of Plaintiff's occupation, the court relies primarily on the descriptions provided by Plaintiff and her co-workers regarding the duties of an

OB/GYN, rather than the Department of Labor's Dictionary of Occupational Titles

("DOT").  The court recognizes that, in some circumstances, it may not be unreasonable

for an administrator to rely on the DOT descriptions or to define "own occupation"

generally rather than with respect to a specific claimant's actual duties.[3]  *See Tsoulas v.*

*Liberty Life Assur. Co. of Boston*, 397 F. Supp. 2d 79, 97 (D.Me. 2005) (citing cases and

noting that "[c]ourts have applied the term, 'own occupation,' generally and have

evaluated disability in light of the usual duties of that occupation, not on ad hoc

peculiarities of a specific job or the requirements of a particular employer who may

require activities beyond that generally contemplated by the 'occupation.'").

Nonetheless, courts routinely look at the specific descriptions of a claimant's particular

job when determining the duties of an occupation under a benefit plan.  *See, e.g., Kalish*

*v. Liberty Mutual/Liberty Life Assurance Co. of Boston*, 419 F.3d 501, 506-07 (6th Cir.

2005); *Moon v. Unum Provident Corp.*, 405 F.3d 373, 374 (6th Cir. 2004).

Because the relevant policy provides that Plaintiff must be unable to perform the

*substantial and material* duties of her *own* occupation, rather than simply the duties of

her occupation, the court believes the better approach is a case-specific analysis of

Plaintiff's exact duties, to determine what the substantial and material duties are.  The

DOT descriptions are to some degree helpful, but due to the language of the plan, the

court finds Plaintiff's particularized description more helpful.  *Accord Dorris v. Cummins*

*Engine Co., Inc. Group Ins. Plan*, No. 3:04-0983, 2006 WL 3759898, *16 (M.D. Tenn.

Dec. 19, 2006) (applying a *de novo* standard and holding that "[t]he court's focus is not

---

[3]The court will discuss below whether Defendant's reliance on the DOT
descriptions in this case was arbitrary and capricious, under its analysis of Plaintiff's
Paul Revere claim for benefits.

on the sedentary classification of [the claimant's] former position by the DOT, but on

applying the language of the Policy to the specific requirements of [the claimant's]

former position.").  Indeed, it is Defendant's application itself which asks for a detailed

description of her duties. (PLA 005.)  It cannot be inappropriate, then, to review

Plaintiff's response in determining her substantial and material duties.

On her 1998 application for benefits, Plaintiff listed the duties of her occupation,

in order of importance, and estimated the percentage of time spent per week devoted to

the activity:  OB/GYN Office Practice, 60%; Surgery, 10% (variable); Deliveries,

(variable); Taking call (in-house call), 25% (variable); Administration, (variable).  (PLA

005.)  Defendant argues that Plaintiff's practice was "clearly tilted toward 'clinic visits'

and not the delivery of babies or the performance of out-patient/in-patient surgeries."

(Pl.'s Mot. Br. at 4.)  Defendant thus tries to minimize the importance of deliveries and

surgeries in Plaintiff's occupation, arguing that because Plaintiff spent most of her time

on clinic duties, deliveries and surgeries were not "substantial and material duties"

under the Provident policy.  The court disagrees.  Although it does not appear that

"substantial" or "material" is defined under the policy, the court is not willing to limit their

meaning to a solely temporal connotation.[4]  The ordinary meaning of these words,

especially when used together, convinces the court that the duties must be essential or

important, rather than merely time-consuming (although *one way* to determine the

importance of a duty may be by the amount of time spent performing it).  It strains logic

---

[4]For example, the court estimates that less than 10% of a typical week is
consumed conducting criminal sentencings, less than 10% of the week hearing oral
arguments, and perhaps even, based on recent experience, less than 10% of the week
presiding over jury trials.  Yet, any federal trial court would consider each one of these
duties as a "substantial and material" part of a judge's occupation.

to suggest that deliveries and surgeries are not "substantial and material duties" of an OB/GYN. Indeed, Dr. Anderson, the Acting Chair of Plaintiff's department, told Defendant's investigator that the hospital did not have partial work available and that an OB/GYN must be able to perform all aspects of her job. (PRL 97.) From the context of the investigator's notes, these aspects included deliveries and surgeries. (*Id.*)

The court's conclusion might have been different if the evidence established that Plaintiff did not perform *any* deliveries or surgeries. The evidence, however, indicates that Plaintiff devoted at least 10% of her time each week to these two activities. Ten percent is not an insignificant percentage of time in any event. Moreover, even without the aid of Dr. Anderson's explanation, the importance of deliveries and surgeries to an OB/GYN's practice is almost self-evident.[5] The court thus finds that deliveries and surgeries, along with clinical office duties and taking calls, are all "substantial and material duties" of Plaintiff's occupation.

### b. Plaintiff's Condition

Upon a full review of the administrative record, the court is persuaded that Plaintiff's condition made her unable to perform the substantial and material duties of her occupation. The bulk of the medical records before the court evince a woman who has struggled with a cervical and arm condition which caused her to experience difficulties since, at least, 1987. (PLA 23, 25.) The condition exhibits itself in MRIs and

---

[5]Defendant argues by implication that Plaintiff performs *fewer* surgeries and deliveries than the average OB/GYN. As discussed above, the court concludes that even with Plaintiff's apparently more limited practice, surgeries and deliveries are substantial and material duties of her occupation. If the court were to look more broadly to the duties of an OB/GYN in general, rather than Plaintiff's individualized duties, the court would conclude, as a matter of common sense, that the general duties of an OB/GYN necessarily include surgeries and deliveries.

22

ECGs which she has undergone over the years, with various reports of, among other things, spinal stenosis, disk or cord compression, disk bulges/herniations and bone spurs, particularly around the C4-C5 and C6-C7 levels. (*See, e.g.,* PLA 32, 36, 215, 424; PRL 498, 88-84.)  A C6-C7 laminectomy surgery performed in 1995, (PLA 41), appears to have not helped her situation, and there is even some evidence that it may have worsened her condition, (PLA 215; PRL 497).  Her treating physicians have continuously observed evidence of radiculopathy with ongoing denervation, and have also noticed some weakness or numbness in the left arm and hand. (*See, e.g.,* PLA 17, 48, 49, 438-39; PRL 327, 884.)

Moreover, her treating physicians have consistently found her unable to perform the functions of her occupation, and have explained why her limitations preclude her from performing surgeries and deliveries.  (PLA 54, 84, 304, 574, 575-76, 578; PRL 710.)  Her former co-workers, supervisors and medical assistant all stated that Plaintiff was unable to perform the functions of an OB/GYN, and that she was specifically unable to perform deliveries and surgeries.  (PRL 97, 776-78.)  Her colleagues have also indicated that Plaintiff unwillingly stopped working, and that she did not want to give up her practice.[6]  (PRL 777; 776.)

The administrative record provides abundant evidence of the pain she was experiencing, as exhibited by the multiple pain medications and treatments which Plaintiff has tried over the years.  Among other treatments, Plaintiff has been prescribed Motrin, Tylenol # 3, Vicodin, Flexeril, Neurontin, Zocor, Prempro and Synthroid.  (PLA

---

[6]The administrative record provides additional support for this in that she was suffering from depression over her medical condition, and was prescribed Paxil to address the depression.  (PLA 18.)

17, 28, 166, 215, 327, 574; PRL 710.)  Indeed, Plaintiff's Vicodin usage has increased

since she first began using it, and it appears that at the time her benefits were denied

she was taking Vicodin up to three times a day.  (PLA 28, 166, 327, 574; PRL 710.)

Plaintiff has had nerve root injections, undergone acupuncture, and worn a "Jobst

stocking" and a Fentanyl patch.  (PLA 17, 132-33; PRL 329.)  There was never any

indication in the record that Plaintiff was abusing her pain medication or "faking" her

pain.  Instead, Plaintiff's records, if anything, reveal a frustration that she could not find

a pain treatment which worked effectively to control her pain.[7]

There does not appear to be any material dispute that Plaintiff's condition

essentially remained stable from 1995 onward.  Rather the parties disagree over the

severity of her condition and, specifically, the veracity of her subjective reports of pain.

Defendant initially approved her claim for benefits, and Defendant's early internal file

reviews confirmed that there was sufficient objective information to support Plaintiff's

inability to perform the material duties of her occupation.  (PLA 259; PRL 50.)

Defendant later changed its opinion, not based upon any change in Plaintiff's condition,

but rather based on surveillance results and disagreeing medical reports from its

internal or retained physicians.  The court finds that the opinions and medical records

from Plaintiff's treating physicians outweigh (1) the opinion of the IME hired by

Defendant, Dr. Mayer (who only examined Plaintiff once), (2) the internal file review

performed by Drs. Brown and Frank, and (3) the outside file review conducted by Dr.

Ross.  In addition to their limited access to Plaintiff, the court finds their analyses less

---

[7]Further evidence of her pain can be suggested from the fact that in 1999,
Plaintiff gained almost twenty pounds in one year, reasonably attributed to a decrease
in her physical activity.  (PRL 325.)

24

convincing than Plaintiff's treating physicians. They did not focus on the substantial and material duties of Plaintiff's own occupation, but only concluded generally that there was a lack of objective evidence to support the conclusion that Plaintiff could not perform the light duties of an OB/GYN. Dr. Ross intimated that a doctor such as Plaintiff could "change her type of practice." (*See* PRL 894 ("It is not uncommon for surgeons to change their type of practice over the course of their years in practice.").) Although the court has no doubt that such changes happen from time to time in the practice of medicine, the policy at issue here is an "own occupation" policy.

Moreover, Defendant rested its determination, to some extent, on credibility determinations of Plaintiff's reports of pain.[8] The court, however, generally finds nothing in the administrative record to doubt Plaintiff's veracity. Her reports of pain have been consistent and believable, and the fact that she has self-reported numerous activities (e.g., operating a home business, and sailing one-handed), if anything, adds to her credibility. Defendant's own retained physician, Dr. Ross, stated that "[t]here does appear to be consistent subjective support of her limitations offered by multiple healthcare providers in addition to herself."[9] (PRL 894.) In sum, the court finds

---

[8]For example, Dr. Brown acknowledged that the objective evidence supported *some* level of impairment (PLA 544), but was apparently not satisfied that Plaintiff's reports of pain were beyond mild.

[9]While Dr. Ross also stated that "some of the information provided by other physicians seems 'coached,' [he felt] it would be unfair to completely ignore it." (PRL 894.) The court is not persuaded by Defendant's argument that it is "beyond debate" that Plaintiff's treating physicians and former co-workers were biased in her favor. (Def.'s Mot. Br. at 13.) It is true that the Supreme Court has noted that "if a consultant engaged by a plan may have an 'incentive' to make a finding of 'not disabled,' so a treating physician, in a close case, *may* favor a finding of 'disabled.'" *Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 832 (2003) (emphasis added). There is no evidence in this case, however, that merely because Plaintiff's physicians were former

Plaintiff's physicians' records and reports are more persuasive and therefore outweigh the reports from Defendant's physicians and examiners.

Further, the court is not convinced that the surveillance videos of Plaintiff significantly impact the weight of the medical evidence. Defendant places much emphasis on these videos, and the court generally agrees that surveillance can be helpful, in some cases, in determining the veracity of a claimant's subjective complaints. *See Tsoulas,* 397 F. Supp. 2d at 94 ("If the surveillance revealed information inconsistent with [the plaintiff's] stated complaints, the surveillance could be used as evidence to terminate her benefits; however, if the surveillance demonstrated limitations consistent with her complaints, it would have supported, not undercut her claim of benefits."). The usefulness of surveillance, in this case, however, is significantly undercut by several factors.

First, the salient issue is whether Plaintiff's condition precluded her from performing the substantial and material duties of her own occupation, rather than any occupation in general. Thus, the focus of Plaintiff's claim review should be on the effect her condition had on her OB/GYN duties, not on the effect her condition had on her life in general. Even Defendant agrees that it was "unlikely to find Plaintiff in the process of delivering babies or performing surgery through its video surveillance, [and thus] the nature of the activities that the Plaintiff was observed performing must be weighed against the physical demands of her occupation of an OB/GYN." (Defs.' Mot. Br. at 11.) The activities to which Defendant points as evidence that Plaintiff's physical activities

---

co-workers, they were biased in her favor. There is no suggestion, for example, that Plaintiff interacted socially with any of the physicians or maintained any kind of close relationship with her former co-workers.

exceeded her claimed limitations do not directly translate to the duties of an OB/GYN.

Defendant principally argues that Plaintiff's activities in preparing her boat for winter

storage establish that she could perform heavy work.  The surveillance indeed shows

Plaintiff lifting and carrying apparently heavy items, moving a ladder, climbing up and

down the ladder, and performing other physically exerting activities.  However, the

nature of this activity, closing down a boat,[10] is an infrequent event.  It is possible that an

individual who suffers from physical limitations could "fight through the pain" for one or

two hours in order to accomplish a task which is only rarely necessary.  On the other

hand, as an OB/GYN, Plaintiff needs to be able to deliver babies or perform surgeries

far more regularly, on a weekly or, sometimes, even daily basis.  While engaged in her

OB/GYN duties, it would not be possible for Plaintiff to take pain medication or to take

breaks.  Further, on the day she worked on her boat, she placed only her own health at

risk, but while performing deliveries or surgeries, she was responsible for the life and

health of her patients, whether mother, child or both.[11]

---

[10] Defendant contends that Plaintiff was preparing the boat for winter storage, (Defs.' Mot. Br. at 5), while Plaintiff argues that she had sold the boat because she could not use it anymore and was preparing it for the buyer, (Pl.'s Mot. Br. at xxvi-xxvii ). Both interpretations are equally plausible given the nature of Plaintiff's activities as shown in the surveillance video.  The court need not resolve this issue, because even accepting Defendant's interpretation, preparing a boat for winter storage is something that occurs only once a year.

[11] Defendant asserts that, prior to 1995, most of Plaintiff's surgeries were breast biopsies, and it is "difficult to imagine how a patient's life would be in jeopardy during a breast biopsy if Dr. Kramer began to feel pain in her left arm."  (Def.'s Mot. Br. at 15.) Given that it is not in the administrative record, the court does not presume to know the exact physical requirements needed to perform a breast biopsy, but does comment that regardless of the degree of difficulty of a surgery, no reasonable patient would choose to be served by a doctor who has less than full functionality in one of her arms and, additionally, who may be under the influence of pain medication.  Moreover, the administrative record contains a letter from one of Plaintiff's former medical assistants,

Moreover, unlike the cases to which Defendant cites in its brief, this is not a situation where the surveillance observed Plaintiff in the act of something she had affirmatively stated she could not do, such as perform housework or get up before noon. *Onofrieti v. Metro. Life Ins. Co.,* 320 F. Supp. 2d 1250, 1255 (M.D.Fla. 2004); *see also Tsoulas*, 397 F. Supp. 2d at 98 (finding that surveillance contradicted claim that the plaintiff could not, among other things, shop for groceries on her own or ascend stairs); *Kiloh v. Hartford Life Ins. Co.*, No. 8:04CV1741T24TGW, 2005 WL 2105957 at *11 (M.D. Fla. Aug. 31, 2005) (finding that surveillance video constituted "objective evidence that Plaintiff's physical capabilities exceeded the limitations that he described to Defendant's investigator in December of 2002 and to his treating physicians" because it showed him bending more, standing longer and carrying items heavier than he said he could).  The activities which Plaintiff was performing on her boat do not directly translate to the duties she and her doctors stated that she could not perform as an OB/GYN, and this is not a situation where Plaintiff was "caught red-handed."

Also, a surveillance should carry less weight under a *de novo* standard than in an arbitrary and capricious review.  The cases on which Defendant primarily relies applied an arbitrary and capricious review[12] which is "highly deferential." *Yeager*, 88 F.3d at 380.  Under an arbitrary and capricious standard, the administrator's decision is upheld if supported by substantial evidence and if it is possible to offer a reasoned explanation

---

who wrote that when performing *endometrial* biopsies, which she described as a common and routine procedure, Plaintiff often could not complete the exam.  (PRL 776.)

[12] *See Tsoulas*, 397 F. Supp. 2d at 98 (applying arbitrary and capricious standard); *Onofrieti*, 320 F. Supp. 2d at 1253 (applying a heightened arbitrary and capricious standard) *Kiloh*,  2005 WL 2105957 (applying a heightened arbitrary and capricious standard).

for a decision.  *Killian*, 152 F.3d at 520; *Perry,* 64 F.3d at 242.  Under such a review, surveillance evidence can take on added importance because of the narrow scope of the court's review.  *See Tsoulas*, 397 F. Supp. 2d at 97-98 ("Within its limited scope of review, this Court cannot dissect the medical history, video surveillance and physicians' reports.").  It is possible that surveillance evidence, especially if particularly strong indicia of the claimant's physical abilities, could provide the basis for a reasoned explanation for an administrator's review.  Under *de novo* review, however, the surveillance evidence is just one factor of many which the court can weigh in reaching its independent decision.

In applying the *de novo* standard, the court attributes little weight to the surveillance evidence.[13]  To the extent Plaintiff's activities are more strenuous than might be expected given her doctor's opinions, the activities do not parallel those which would be performed as an OB/GYN.  They are limited in duration, likely performed while under the influence of pain medication, and are not performed while a patient's life is in Plaintiff's hands.  Under these circumstances, the court agrees with the *Onofrieti* court, which stated that any "minor inconsistencies do not justify a court discounting a plaintiff's subjective complaints."  *Onofrieti,* 320 F. Supp. 2d at 1255.

Accordingly, the court finds that Plaintiff's condition precludes her from performing the material and substantial duties of her own occupation and, applying the *de novo* standard, finds that Plaintiff is entitled to disability benefits under the Provident

---

[13]  The court does pause to comment, however, that as Plaintiff was seen, unawares, walking here and there, getting in and out of a vehicle, and so on, she appeared to be a person who was, at times, in *some* degree of pain. To this court's eye, fairly often she did not move easily and normally, but was guarding or restricting the movement of her body.

policy.

## 2. Paul Revere Policy

The court will next review Defendant's denial of Plaintiff's Paul Revere claim under an arbitrary and capricious review. As stated above, the arbitrary and capricious standard is "highly deferential." *Killian*, 152 F.3d at 520 (citing *Yeager*, 88 F.3d at 380). The standard "requires that the decision 'be upheld if it is the result of a deliberate principled reasoning process, and if it is supported by substantial evidence.'" *Id.* (citing *Baker*, 929 F.2d at 1144).

## a. Allegation of Bias

As the court has already held, when, as here, an entity both funds and administers the plan at issue, "there is an actual, readily apparent conflict." *Killian*, 152 F.3d at 521, which "must be weighed as a 'facto[r] in determining whether there is an abuse of discretion.'" *Bruch*, 489 U.S. at 109 (quoting Restatement (Second) of Trusts § 187, comment d (1959)). To that end, the "application of the [abuse of discretion or arbitrary and capricious] standard should be shaped by the circumstances of the inherent conflict of interest." *Borda*, 138 F.3d at 1069 (quoting *Miller*, 925 F.2d at 984). The conflict of interest is just one factor which must be weighed when determining whether Defendant acted improperly. *Killian*, 152 F.3d at 521.

Here, Plaintiff argues that Defendant's actions reveal an egregious bias which justifies, or bolsters, a finding that it acted arbitrarily or capriciously. Relying on the affidavit of Mary E. Fuller,[14] one of Defendant's former employees, Plaintiff argues that

---

[14]Defendant objects to the submission of Mary E. Fuller's affidavit, as the evidence in ERISA cases is usually limited to the administrative record. *See Wilkins v. Baptist HealthCare*, 150 F.3d 609 (6th Cir. 1998). This general rule, however, has

Defendant failed to comply with its claims manual and other required procedures. Specifically, Plaintiff argues that (1) the files of Plaintiff's claims are not mirror images of one another and therefore not complete; (2) the documentation which normally exist regarding the treatment of Plaintiff's disability as permanent and total is not contained within the Administrative Record; (3) Defendant did not follow the "appropriate procedures" in requesting additional medical treatment or in the manner in which it sought an outside consultant examination; (4) the use of surveillance under the circumstances was improper; and (5) Defendant purportedly engaged in conduct found to have been illegal by the Multi State Market Conduct Examination.  The court does not find that these alleged actions, even if true, establish a bias against Plaintiff.  The specific actions amount to little more than procedural irregularities, not the sort of vindictive or blatantly inappropriate behavior which would prove that Defendant's alleged bias amounted to an arbitrary and capricious denial of Plaintiff's benefits. Indeed, Plaintiffs arguments, as well as Fuller's affidavit, go to the substance of Plaintiff's claim for benefits, rather than prove the allegation of bias.  Similar to Plaintiff's procedural challenges, which the court rejected in its February 10, 2006 order, Plaintiff is arguing that because she was entitled to benefits, Defendant's denial reveals a bias. (*See* 2/10/06 Order at 5.)  Circular reasoning is not a sufficient basis to prove Defendant's bias.

---

some exceptions, one of which is relevant here.  While the court may not consider the Fuller affidavit in connection with the merits of Plaintiff's claims for benefits, the affidavit is admissible in proving an alleged bias on Defendant's part. *See id.* at 619 (Gilman, J., concurring).  The court accepts the affidavit for this limited purpose.

Thus, while the court has already found that there exists in this case an irrebuttable presumption of a conflict of interest because the administrator of the plans doubled as the payor, (*see* 6/6/05 Order), the court does not find that this conflict of interest revealed itself in any outrageous exhibitions of bias.[15]  The court will therefore consider Defendant's "actual, readily apparent conflict" of interest as one factor, but not a particularly strong factor, when considering whether Defendant's actions were arbitrary and capricious.  *Killian*, 152 F.3d at 521.

### b.  Review of Defendant's Denial

The Paul Revere policy, which, like the Provident policy, is an "own occupation" policy, provides that Plaintiff will receive benefits if she "is unable to perform the important duties of [her] own occupation on a Full-time or part-time basis because of any injury or sickness that started while insured under this Policy."  (PRL 450.) Defendant, principally relying on the DOT definitions to determine Plaintiff's duties, found that Plaintiff was able to perform these functions and was consequently not disabled.  Although the court would disagree with this determination under a *de novo* review, for the reasons explained above, the court cannot find that this decision was arbitrary and capricious.

First, it was not arbitrary and capricious to rely, at least in part, on the DOT definitions to determine Plaintiff's occupation.  The Sixth Circuit has found that an

_____

[15]Similarly, the court rejects Plaintiff's various arguments, sprinkled throughout her brief, that various words or phrases used by Defendant in internal records evince a bias against Plaintiff's claim.  (*See, eg.,* Pl.'s Mot. Br. at xxi, use of "alrighty then;" *id.* At xxiv, use of "game plan.")  The challenged phrases are just as susceptible of a benign connotation as they are of the improper connotation which Plaintiff attempts to attribute to them.

administrator's use of the DOT definitions to determine a claimant's "own occupation" was not arbitrary and capricious, "but on the contrary was 'reasonable.'  The word 'occupation' is sufficiently general and flexible to justify determining a particular employee's 'occupation' in light of the position descriptions in the [DOT] rather than examining in detail the specific duties the employee performed."  *Osborne v. Hartford Life and Acc. Ins. Co.* 465 F.3d 296, 299 (6th Cir. 2006); *see also Jones-Stott v. Kemper Lumbermans Mut. Cas. Co.*, No. 04-40263, 2007 WL 470474, *10 (E.D. Mich. Feb. 7, 2007.); *Hester v. Union Cent. Life Ins. Co.*, No. 1:03cv447, 2006 WL 2927252, *4 (S.D. Ohio Oct. 11, 2006).

Nor does the court find that Defendant's particular classification of Plaintiff was arbitrary and capricious.  Defendant's occupational analysis classified Plaintiff as an Obstetrician, under DOT code 070.101-054.  (PRL 511; PLA 250.)  Tim Bird, who performed the analysis, wrote that this occupation is classified as "Light Work," which requires

> lifting, carrying, pushing, pulling 20 lbs occasionally, frequently up to 10 lbs., or negligible amount constantly.  It may include walking and or standing frequently even though weight is negligible, and pushing and or pulling of arm and or leg controls.  Also, it may include constant near acuity; frequent handling, fingering, feeling, talking, hearing and accommodation, with occasional reaching and color vision.

(*Id.*)  On March 25, 2004, Plaintiff was interviewed, apparently voluntarily, by Robert B. Ancell, who Plaintiff asserts is "an expert in vocational rehabilitation analysis."  (Pl.'s Mot. Br. at 16.)  Dr. Ancell concluded that Mr. Bird had used the incorrect vocational classification, by relying on Obstetrician rather than Obstetrician/Gynecologist, which is classified as DOT code 070.101-034.  (PRL 772.)  Dr. Ancell further indicated that Tim Bird incorrectly defined "light work," in that "light work" is "exerts force to 20 pounds

33

occasionally or ten pounds frequently or negligible force constantly." (PRL 772.)

Further, the correct definition, according to Dr. Ancell is that it "may involve significant

standing walking, pushing, and/or pulling." (*Id.*)

The website for the DOT job classifications lists Obstetrician at 070.101-054 and

simply Gynecologist (rather than Obstetrician/Gynecologist) at 070.101-034.[16] Plaintiff,

of course, was both an Obstetrician and a Gynecologist. Thus, the court is not

convinced that Plaintiff's proposed classification is more accurate than Defendant's.

Nonetheless, because Plaintiff was required to perform *both* jobs, it seems most

accurate that *both* classifications should be at least considered. Nonetheless, the court

is not convinced that Defendant's characterization of Plaintiff as an Obstetrician, nor its

characterization of the functions of "light duty," was arbitrary and capricious. Even

accepting Plaintiff's argument that Defendant's characterizations were incorrect, they do

not significantly differ from Plaintiff's proposed characterizations. Moreover, the medical

records on which Defendant relies do not analyze *in detail* every particular function of

"light duty" under the DOT definitions. If, perhaps, a doctor had specifically stated that

his conclusion was based entirely on the characterization of Plaintiff's occupation under

the DOT definitions, and included detailed reasons why such was the case, then it *may*

be arbitrary and capricious to rely on that report *if* the underlying definition was in fact

*clearly* incorrect. However, Defendant's denial was primarily based upon the premise

that Plaintiff's objective symptoms did not support her subjective complaints of pain and

did not preclude her from her work as an OB/GYN. While the DOT characterization was

at least taken into consideration by Defendant, to some extent, its physicians' reports

---

[16]*See* http://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOT01B.HTM.

relied on a more general view of Plaintiff's occupation for their conclusions.[17] Defendant's reliance on these reports, in turn, was not arbitrary and capricious.

Nor was it arbitrary and capricious for Defendant to find that Plaintiff's limitations did not preclude her from performing her own occupation. Defendant's determination was based on the surveillance conducted by Defendant as well as on the conclusions offered by Drs. Mayer, Brown, Frank and Ross, who opined that there was a lack of objective evidence to support the conclusion that Plaintiff could not perform the duties of an OB/GYN. While the court could quibble with certain aspects of each of the doctor's opinions, when viewed collectively and in conjunction with the surveillance videos, Defendant's reliance on them was reasonable.[18] Plaintiff's treating physicians relied to some extent on Plaintiff's subjective reports of pain. It was not unreasonable for Defendant to discount these opinions given its physicians' conclusions that the objective conditions did not support a severe limitation. The Sixth Circuit has held that:

> Generally, when a plan administrator chooses to rely upon the medical
> opinion of one doctor over that of another in determining whether a

---

[17]The court's conclusion might be different if Defendant were *required* to base its characterization of Plaintiff's occupation on the DOT definitions. However, case law only suggests that it is not arbitrary and capricious to *consult* the DOT definitions when determining what an occupation entails. As the Sixth Circuit stated in *Osborne*, the word "occupation" is "general and flexible," *Osborne,* 465 F.3d at 299, and this court finds that defining an occupation is not an exact science. Under the "highly deferential" arbitrary and capricious review, certain latitude is given to an administrator in defining the occupation.

[18]For example, although Plaintiff identifies certain holes in Dr. Mayer's analysis which, in the court's mind, establish that his opinion is inferior to Plaintiff's treating physicians, the court cannot say that it was inherently or blatantly flawed. Plaintiff's most serious allegation, that Defendant did not send all the relevant medical records to Dr. Mayer, is not conclusively established by the record. Dr. Mayer may have only referred to some of the records in his report, but this does not necessarily mean that Defendant did not provide all of the records to him.

> claimant is entitled to ERISA benefits, the plan administrator's decision
> cannot be said to have been arbitrary and capricious because it would be
> possible to offer a reasoned explanation, based upon the evidence, for the
> plan administrator's decision.

*McDonald v. Western-Southern Life Ins. Co.,* 347 F.3d 161, 169 (6th Cir. 2003). Here,

Defendant's reliance on, not one, but four physicians' opinions reveals "a deliberate

principled reasoning process" which the court must find "is supported by substantial

evidence.'" *Killian*, 152 F.3d at 520 (citing *Baker*, 929 F.2d at 1144).

This conclusion is further bolstered by Defendant's reliance on the surveillance

videos. Although, for the reasons discussed above, the court is not persuaded that they

exhibit activity sufficient to outweigh the opinions of Plaintiff's treating physicians, the

court cannot conclude that Defendant's characterization of them was arbitrary and

capricious. Plaintiff does, in fact, appear actively involved in at least somewhat

strenuous activity which, viewed in a certain light, could reasonably contradict or

diminish her subjective reports of pain.[19]

The court recognizes that, especially in recent years, the Sixth Circuit has

stressed that, while deferential, the arbitrary and capricious review "is not . . . without

some teeth." *McDonald,* 347 F.3d at 172 (citations omitted). As the Sixth Circuit has

recently stated, "merely because our review must be deferential does not mean our

---

[19] The court is somewhat troubled by Defendant's lack of explanation of the editing and/or deletions of footage apparent in the surveillance videos. However, there is nothing before the court establishing that the deletions are the result of nefarious behavior by Defendant or its agents, and the court can readily imagine benign explanations – including something as simple as the surveillance operative getting tired of holding the "record" button. Indeed, a great deal of extraneous video was presented with the "record" button activated. Moreover, even without the surveillance videos, the court would not find that Defendant's denial of benefits was arbitrary and capricious inasmuch as Dr. Mayer based his initial report on the medical evidence alone, without reviewing the surveillance videos.

review must also be inconsequential.  While a benefits plan may vest discretion in the

plan administrator, the federal courts do not sit in review of the administrator's decisions

only for the purpose of rubber stamping those decisions."  *Moon v. Unum Provident*

*Corp.,* 405 F.3d 373, 379 (6th Cir. 2005).  Nonetheless, because the application of the

standards allows for some degree of deference, the court must conclude, in this case,

that with the benefit of four physicians' opinions and at least colorably contradictory

surveillance results, Defendant's decision to deny Plaintiff's benefits under the Paul

Revere policy was not arbitrary and capricious.

## V.  CONCLUSION

For the reasons stated above, IT IS ORDERED that Plaintiff's "Motion for Leave

to File a Supplemental Brief, or, in the Alternative, to Strike Defendant's Sur-Reply Brief"

[Dkt. # 33] is GRANTED IN PART.  It is GRANTED in that the court will accept Plaintiff's

already-filed supplemental brief.  It is DENIED in all other respects.

IT IS FURTHER ORDERED that Plaintiff's motion for judgment [Dkt. # 22] is

GRANTED IN PART AND DENIED IN PART, and Defendants' motion for judgment

[Dkt. # 24] is GRANTED IN PART AND DENIED IN PART.

IT IS ORDERED that judgment shall issue forthwith for Plaintiff against

Defendant Provident, and

IT IS ORDERED that judgment shall issue forthwith in favor of Defendant Paul

Revere against Plaintiff.

Finally, IT IS ORDERED the parties shall consult and jointly present a proposed

"Amended Judgment," agreed upon as to form and including all amounts owed to

Plaintiff under the Provident policy, and submit it to the court within three days of the

date of this order.  In the event they cannot agree, the parties shall each submit their

own proposed form of  "Amended Judgment," and the court will select the proper form.


        S/Robert H. Cleland
        ROBERT H. CLELAND
        UNITED STATES DISTRICT JUDGE

Dated:  March 26, 2007

I hereby certify that a copy of the foregoing document was mailed to counsel of record
on this date, March 26, 2007, by electronic and/or ordinary mail.

        S/Lisa Wagner
        Case Manager and Deputy Clerk
        (313) 234-5522